To the third case this morning, Indiana Electrical Workers v. Manweb Services. May it please the Court, my name is Rachel Parisi on behalf of Appellants and we respectfully request that this Court reverse the decision of the District Court which granted summary judgment in favor of Manweb and denied the plan's motion for summary judgment. This case presents the questions of whether Successor Liability's continuity element was satisfied and whether the District Court erred in weighing the equities in favor of Manweb. The plan argues that both questions should be answered in the affirmative. Successor Liability's continuity element was satisfied and the District Court erred in holding otherwise. The District Court improperly evaluated the continuity element in three ways. First, it erroneously relied on an untested Ninth Circuit case. Second, it created a dangerous loophole which unfairly advantages larger companies. And third, it failed to properly review the plan's compelling evidence on 11 of 14 factors that demonstrated that Manweb continued Tiernan and Hoover's business operations. To our first point, resilient, a Ninth Circuit case relies on an incorrect rationale and the District Court was incorrect in relying almost exclusively upon that case. We would note that the District Court made the shared customer factor nearly dispositive in deciding the case below, which in itself is an error. As we know from Tsemkin, no one factor is dispositive in the continuity analysis. Counsel, I don't quite understand your running away from resilient flooring, given the Ninth Circuit's focus in essence on the public presentation of the successor buyer. I read that case as saying in essence that if you as a buyer present yourself to the public, to customers, et cetera, as the successor in terms of the services you're providing, carrying through on the contracts, that that's really the most important, compelling way. I mean, obviously the details were a little bit different and that's where I understand you don't like a few of the details, but if we look beyond the individual trees of those factors, the forest in resilient flooring is very supportive of your case. Right. I understand, Your Honor. And as a matter of fact, when the plan provided supplemental authority in between the prior appeal of this case and the District Court's decision on the summary judgment motion below, we did actually cite to resilient as supportive of our position for exactly the reasoning you just mentioned. We originally read resilient just as you did, citing to the fact that if you hold out the goodwill, the public representation, and so forth, exploiting customer contacts, that that in fact weighed in favor of continuity. However, the District Court's reading of resilient was very much different. And in fact, they used resilient to undercut the entire... Well, then your disagreement is with the District Court's reading, not with the Ninth Circuit. Well, when we drilled down into resilient, we realized that it was relying on an incorrect rationale, and we think that was carried through in the District Court's opinion. If I could continue... Please. Okay. So as I was saying, the Ninth Circuit and the District Court is requiring construction industry plans to demonstrate a successor's market capture of economically critical bulk of customers in order to establish continuity. The Ninth Circuit bases this novel requirement on application of the construction industry exemption. That's a flawed rationale, and the District Court carries through this misunderstanding in its opinion on the record at appeal at page 23 where it states, quote, the concerns which withdrawal liability seeks to avoid are not present here. To wit, ManWeb did not ultimately attract Tiernan and Hoover's customers. The Ninth Circuit and the District Court have therefore conflated the rationale for the building construction industry exemption with the underlying purpose of withdrawal liability itself. The underlying policy concern of withdrawal liability of the MPPAA is to ensure that remaining employers are not left holding the bag when other employers withdraw from the plan. That's the analysis performed by this court in this case's prior appeal. That's the analysis performed by the United States Supreme Court in the Bay Laundry case. Here, we've already established a withdrawal. 29 U.S.C. 1383, which sets forth the building and construction industry exemption, has already been met. This case, from its inception in the District Court, is just a collections case. It is not a withdrawal case. Under resilient, the plan is effectively being asked to establish a withdrawal plus because of this heightened standard of showing an economically critical bulk. That does not promote the purpose of the MPPAA or successor liability in general because of this higher burden that's being imposed on building and construction industry plaintiffs, such as the plan. It requires the elevated standard of economically critical bulk, requires demonstration of detailed billing percentages, and again, makes that continuity of customers standard more heavily than any other factor. Other than the assignment of existing work in completing a certain, whatever it was, I don't know nothing about it. After that, it seemed to me that they were completely out of that business. Actually, ManWeb did actually do additional work as set forth in the briefing, Your Honor. The evidence shows that ManWeb was referred customers that previously had worked for Tiernan and Hoover, and that is set forth in the record. Greg Webster, or excuse me, Mike Webster, ManWeb's CEO, did refer to that. In our brief at page 25, we cite to testimonial evidence from Greg Taylor, who cited to customers such as Lilly, Roche, Maplehurst Bakeries, and Pepsi. These were all customers for which ManWeb did work after the wind-down period. Were those customers before? Those were not customers before. But there were some customers that they had that were common, is that right? There were some common customers prior to that, yes, Your Honor. I don't know exactly what they did. What about the people for whom there were contributions being made to the fund? None of those ended up with whatever the name is, this company. ManWeb? Yeah, ManWeb. That's correct, Your Honor. There were no unionized employees that ended up going from Tiernan and Hoover to ManWeb. However, the test is actually whether or not there are shared employees. And as we stated in our brief, and even as Resilient noted, whether or not your unionized employees make the jump is really more of an issue for an NLRA case. Here we're looking at pure successorship. And again, this is another issue where we believe the conflation of that building and construction industry exemption somewhat tainted the district court's analysis of the importance of those unionized employees, because she looked at the value of those pension contributions, which in this case really has no importance or does it? Correct. We did have the same work. We had the same employees. And again, as we demonstrated in our chart at page 45 and 46, we had evidence on 11 of the 14 factors of continuity. And when we're talking about withdrawal liability, getting rid of all the unionized employees with the buyer, with the seller, and replacing them with new non-union employees with the buyer doesn't actually weigh in the employer's favor, I would think. In terms of policy, that's the kind of thing that the Congress is trying to prevent. Your Honor, we would argue that that was the point of this withdrawal. At that point, we had already established that the withdrawal occurred. And the principal focus I would think would be on kind of the key employees. We have the Freegee name continuing in use. We have the marketing of Freegee's expertise and reputation and the key folks who are going on. That's the holding out as a continuation. That's correct, Your Honor. There was significant information and evidence showing that ManWeb did hold itself out as Tiernan and Hoover starting from day one after the asset purchase agreement. But all using the name Freegee, right? Everybody uses Mr. Freegee's name. Correct. Okay. And again, I would point out again that the underlying purpose here for the MPPAA is to protect those remaining employers. The withdrawal liability had already been established by the withdrawal of Tiernan and Hoover, which was again established prior to this case ever being brought in the district court back in 2010. So the successor liability analysis then is just looking forward at these continuity elements. I also wanted to discuss the loophole created by the district court. The plan's position is that the district court created a dangerous loophole that unfairly advantages larger entities by function of simple mathematics. The district court evaluated the two entities, Tiernan and Hoover, in ManWeb as if they were the same size, despite to Simpkin's teachings that we must evaluate the totality of circumstances. Under the district court's test, a larger pre-existing entity will always necessarily win or succeed on any quantitative comparison factor test. It's more appropriate instead to focus on a percentage of the predecessor's employees that resurface, whether it be employees or supervisors or what have you, that resurface at the successor, rather than the percentage of the successor's total workforce or supervisory workforce. Under the test used by the district court, the plan faced an automatic fail, and the district court ruling, if affirmed, will invite other larger entities to absorb smaller entities without any fear of successor liability. That contravenes the MPPAA and the doctrines underlying successor liability in general. Well, that requires, actually, when you say absorb a smaller one, I would use the analogy of just swallow it whole, and it didn't, it seemed to me, whatever it was, it disintegrated. Whatever they took over. Now, maybe you have reasons to say that's not the case. They did continue with a lot of what was going on in order to get the continuity, but it does seem that this took a sharp diversion from what was originally did. They hoped to get a hold of some other freed and whatever else it is, but it seemed that all melted once it, I wouldn't call it absorbed. I don't know what went beyond that, where the other workers went. You say that's not relevant. Maybe it isn't. Maybe they did something completely different for the same union. Working on the same union, that successor had the obligation. What we're looking at is withdrawal liability, and what is it, $650,000? $666,000. That's a change. That's huge. It seemed to me, how many were there, 15 or so? 13 employees from Man Web, excuse me, from Tiernan and Hoover made the jump to Man Web. Those were not unionized employees. There were 13 being, on whose behalf they were being paid into the fund? No, there were, I believe, I'd have to check the record again, far fewer than 13. Well, where'd all that, they just must not have been paying for quite a while. Well, again, the distinction here is between delinquent contributions and withdrawal liability. The withdrawal liability represents Tiernan and Hoover's share, proportionate share of the unfunded vested benefits of the plan, and is not related to delinquent contributions for those particular employees. And I would note again. Maybe I just don't understand that, which is probably correct. I think it's an important distinction, Your Honor. Withdrawal liability is, it's pretty punitive, I guess. Maybe it's supposed to be. Well, it's actually, again, it goes with the policy underlying the MPPAA. The idea is not to allow an employer to withdraw from the plan and leave behind the vested benefits that have been promised to those pension participants. Again, it's a defined benefit plan. Whether or not Tiernan and Hoover has left the plan or not, the pension participants in the pension plan will receive those benefits. And everybody was, both the buyer and the seller, had the opportunity and incentive, I assume, to challenge the calculation, right? That's correct. And there was no challenge to the calculation. That is correct. You say the buyer had the incentive to do that, because I don't understand why it wasn't challenged, but maybe that's another question. Well, again, in the prior appeal of this case, it was determined that ManWeb did have notice, and I would point out, importantly, this is a point the district court did not address, ManWeb did not review the equities that were analyzed by the district court. The district court did not address the indemnification issue. This court held in the prior appeal it would be equitable to impose successor liability on ManWeb in the context of notice in that prior appeal, because ManWeb did obtain indemnification against Tiernan and Hoover. The same holds true that it would be equitable here to hold ManWeb liable for successor liability, because, again, it did obtain indemnification. It had notice, and the default rule in this circuit is if a successor has notice, successor liability is the default rule. Despite that default rule... Where do you get that? That's Worth versus Tyler in the Seventh Circuit. Thank you. Okay. If there are no further questions, I will reserve my remaining time for rebuttal. Thank you. The district court's decision is correct, because a holding that there was continuity of operations between Tiernan and Hoover and ManWeb requires a finding that ManWeb continued without interruption or substantial change, Tiernan and Hoover's business, and that's just not the case here. The record in the case fails to support the plan's request for reversal, because it contains no evidence of significant work done by ManWeb after the closing on the asset purchase agreement. And those are the facts necessary to prove continuity of operations. Didn't they finish the contracts that were pending? Your Honor, there were So why isn't that continuity of work? Well, because in this case, as the district court pointed out, the context of that work is important. Tiernan and Hoover paid ManWeb for that work. So what? I mean, it's part of the deal, but why are we worried about the exchanges, about the sale price? Well, Tiernan and Hoover didn't just receive, I'm sorry, it wasn't part of the Tiernan and Hoover compensated. It was part of the overall asset purchase agreement, right? Well, that's right, Your Honor, but it's important. That the profits from those contracts, when completed, would be paid to the sellers of the business, right? Who were also the guys who were indemnifying the buyer on the potential withdrawal liability, right? Right, and there's one additional step, Your Honor. The profits from that business was required to go to pay down the line of credit that Tiernan and Hoover had as a debt, and so it's important in this context, though, because in essence, Tiernan and Hoover subcontracted the work. The work remained. It's not a continuation of Tiernan and Hoover by ManWeb. It is Tiernan and Hoover's wind down, and I think that's important. The second reason is, as the district court pointed out, results matter. The record contains no evidence beyond the 12-month period, the 12 months that included Tiernan and Hoover's wind down, of any additional work. And I think it bears explaining a little bit of the background on the case. The first appeal was on the notice issue, and this court held that ManWeb did have notice of a potential liability, and that was sufficient, but ManWeb never received the notice requiring it to arbitrate or to do anything. You asked for indemnification, correct? And that's right. You insisted, I assume. Well, it was a standard provision in the contract, Your Honor, and I think that looking at that in the proper context is important as well because what we have here is a purchase price of a little over $250,000 for the assets. We have a liability at the point of assessment that was in excess of $660,000. And so we also have provisions in the agreement requiring Tiernan and Hoover to pay over the proceeds from the sale to pay off, to release the lien from the assets. Right. It was in deep trouble. And that's the point here. Aside from it's difficult to imagine an asset purchase agreement without some kind of an indemnity provision, but two things. For withdrawal liability. Well, for a number of things, very broad. For many things, but when we're talking here about an important federal policy that protects workers and their unions and their benefits for the long term, where there's a great risk of underfunding and a kind of death spiral developing, I'm not criticizing your clients for seeking the indemnification or obtaining it, but it does mean that their eyes should have been wide open and they certainly had every right to insist on knowing from the sellers what the status of that process would be and an opportunity to participate if there was a reason to challenge the number. And that's right, Your Honor. And the state of the law at that point didn't indicate that it was a possibility because you had to assume an eventuality that wasn't, frankly, within the party's contemplation. What, that there might be found a continuation here? No, Your Honor, that Tiernan and Hoover would fail to arbitrate the assessment and go to arbitration where... about what was going to happen with this potential liability? Well, Your Honor, the point is looking at the value or the meaning of the indemnity agreement and in this context to say that Man Web is in a position to look to, it is now by virtue of the indemnity provision required to look to Tiernan and Hoover for indemnity on this obligation is elevating the provision's form well above the substance of the circumstances. It's a standard provision in the contract. Why is that elevating the form? Presumably that's a valuable, well, maybe it's not. Is it only the corporate seller that was indemnifying or was it also the principals?  Well, and that's the point. There was no money. The bank got the money. The bank got the money for the assets. Well, obviously it's worth nothing. The indemnification, you're not going to get anything from that. That's right. And not only that, but when you're looking at the purchase of the assets, trucks and other things may have sold most of those. I assume that's what they purchased with an asset purchase. The thing that confused me about this thing from the start is what was the benefit of the purchaser from buying this failing company who had some business? The only thing of attraction seemed to be that, what is it, Freebie? Freegie is the name, Your Honor. Freegie had some kind of an aura of admiration or whatever, and they thought they would at least get that name and be able maybe to entice, which didn't apparently work out, some new business. That's important, Your Honor, because ManWeb was doing business at the time of the transaction as a company called Enterprise Electrical and Mechanical. It did purchase the name The Freegie Company and registered with the State of Indiana as doing business as The Freegie Company. ManWeb was also registered with the State of Indiana as doing business as Enterprise Electrical and Mechanical. ManWeb did not use the name The Freegie Company at any point, even up until today. In October of 2010, 14 months after the transaction, one portion of the name, it became Freegie Engineered Solutions, but that was 14 months after the transaction. As far as the continuation of the identity of The Freegie Company, if I was going to... What about the website, the phone numbers, the letterhead, and the presentations of the customers about how Freegie and these other key employees are going with us? We'll start with the website. ManWeb never operated or maintained Freegie's website. What's in the record is a redirection from someone who were to Google the name The Freegie Company, then Enterprise Electrical and Mechanical's website comes up. The point with that, and the reason that's important, is that you know when you're going to a website if that website is what you were looking for. That is, no one, I think, could seriously contend that someone looking for The Freegie Company's website, who was sent to Enterprise Electrical and Mechanical's website, would say, oh, this is The Freegie Company's website. They're different. Similarly with the telephone. The telephone numbers were forwarded as part of the asset purchase. And those phones were answered after the transaction as Enterprise Electrical and Mechanical. And so the caller says, I thought I was trying to call Freegie. And what does the person on the phone say? Well, I don't know, Your Honor. It's not in the record, but there would certainly be, there was a portion on the website, well much later after the fact, and a transaction in general terms, not sophisticated terms. Do we have those in the record? I believe they're in the record, yes, Your Honor. I'll just finish with the letterhead, Your Honor, if I might. There was not a letterhead used that contained The Freegie Company's logo. It was a dual logo with Enterprise Electrical and Mechanical and The Freegie Company's. And it was for a brief period of time. Well, I think it's important because as far as representing, holding out the identity of the company, there's clearly a difference between one logo versus two. And for the 14 months, and even until today, the Freegie Company name has not been used. And so some of those concerns with respect to holding the company out as a continuation of The Freegie Company fall away when you really look at the details. Did the customers come to the physical locations, the facilities? There was one facility, Your Honor, and that facility was, and it's important here, the continuity of operations analysis is a multifactor test. No one factor is dispositive. Did the customers come? I suppose some did, but there's no information on that in the record that I'm aware of. They didn't maintain the same facilities. Excuse me, Your Honor? They did not maintain the same facilities. That's exactly right. This is construction work that's done on the customer site, right? That's right, Your Honor. It is construction work. That's why I asked if they came to the facilities. And to the appellant's point in her opening remarks, the policy behind the building and construction industry exemption is important here because the animating concern has to do with, there has to be a link. There has to be a link before we will transfer liability to another entity for the withdrawal. And the purpose behind the building and construction industry exemption is that it recognizes in the construction industry employees may do covered work for dozens or even hundreds of employers throughout their careers. And as long as those employees who leave a closed company and go to the union's hiring hall and are picked up for additional covered work by an employer who's obligated to make contributions, there's no harm to the plan's funding base. But let's look at the, that assumes the company is going out of business, right? And it's not essentially going to continue doing the same kind of work but outside the aegis of the union and its benefits, right? I'm going to the resilient flooring language, pages 1095 and 96. If instead an employer uses its, and this would be the buyer, uses its insider knowledge to draw a great many of the predecessor's customers and so can pick up where the predecessor left off doing the same time of work as the predecessor yet neither contributes to the pension plan nor pays withdrawal liability, the assumption that animates that construction industry exception collapses. Instead the plan's contribution base is compromised and financial stability threatened. Why isn't that what's going on here? That's a great point. And the reason that's not what's going on here, Your Honor, is that ManWeb Resilient Floor, that was a successor company or an alleged successor company that was started within a very, very brief period of time of the demise of the predecessor. It sounds like you're about to give me the big buyer exception. No, Your Honor. What I am going to tell you is that ManWeb was doing electrical work in the Indianapolis area and in the Midwest from 2003 forward. With refrigeration engineering? Well, no, but the work that we're talking about is important. That is to distinguish refrigeration or rather plumbing from sheet metal from electrical work. We're talking about a compromise, an alleged compromise of the funding base of the plan because of non-contributions for electrical work. And ManWeb was doing electrical work in the jurisdiction for years. And it didn't, as it was batted around on the opening remarks, ManWeb didn't get rid of the union electricians. ManWeb employed a sufficient number of electricians to complete the assumed contracts. Were they already working there? ManWeb's electricians? Yes, Your Honor. So these were just current employees that took over in order to complete that other work? Well, they did that assumed, they did work on the assumed contracts, the electrical work that was required, and the amounts are in the record. It's a very small amount. It's minuscule. It's 1.3% of all of ManWeb's electrical work for that 12-month period, and it's less than 1% of the electrical revenue for the period. Yeah, but those percentages are what trouble me, okay, because that's the big buyer loophole that we're talking about, right? Why should we worry about that? The plaintiff's math is wrong on page, I think, 29 of their brief when they're percentages, but the basic principle is correct, that if the big buyer comes in and we focus on what percentage of the buyer's revenues, customers, and employees came from the seller, then there's never going to be continuity, right? Well, I don't think that quite captures it all, Your Honor. I think going to the other way, and I think Resilient Floor in this regard is persuasive. The court in Resilient Floor was not persuaded that a simple head count is enough because ManWeb does a number of services. It does HVAC. It does security systems. It does refrigeration. And so to say that the number of customers that we shared, and, oh, by the way, ManWeb was doing business with some of these customers prior to the transaction. We shared a number of customers, and therefore ManWeb has a sufficient length and should be liable, and that's equitable, and that's just not the case. We're talking about electrical work. Is it correct that you all are pursuing attorney fees in the district court? That's correct, Your Honor. Where does that stand? I believe the district court has stayed, depending on the outcome of this appeal. What is the basis for that claim? Well, Your Honor, the basis for the claim is that, if I may finish. Please. That at the time of the lawsuit, and even today, the continuity of operations requirement requires that, you know, under Fall River Dying that a majority be made up of the predecessor's employees. But here, in any case, in any case you find about success or liability, there must be bargaining unit employees or those employees for whom contributions were paid must come over. That doesn't make any sense as applied to MPPAA success or liability. And, frankly, I would find a fee award here astonishing. I mean, it may or may not have been an abusive discretion of the district court to deny the plaintiff's relief, but I also can't imagine it would have been an abusive discretion to grant relief. I understand, Your Honor. And we urge that this court affirm the district court's decision. Thank you, Your Honors. Thank you, Counsel. You have about a minute, Counsel. In rebuttal, I'd just like to address a few quick points. As to the notice argument that ManWeb brought up, I would point out that ManWeb does not have a right to arbitrate. And further, the notice argument does not go to notice of the right to arbitrate. That was resolved in the prior appeal. Again, it did have notice via the complaint, again, resolved in the appeal. It was not the plan's fault that the indemnification was worth nothing. ManWeb was well-counseled, sophisticated entity, and had every opportunity to negotiate that. In terms of Your Honor's question about what was the benefit of the sale, I would say that you had hit that right on the head. To us, the benefit of the sale was ManWeb's intent to continue Tiernan and Hoover's operations. There was no real estate. There was no physical assets to be had. The idea here was to continue the operations, and that's exactly what ManWeb did. You say no physical assets. You don't include all the other stuff. Excuse me, yes, Your Honor. Most of those were sold. The real estate was – there was no real estate, no building. Right, no real estate. But it was the name, the goodwill, the contracts, and the customer relations. The name, the goodwill, the corporate identity, the 50-year history, trade name, website, logos, phone numbers, pager numbers, e-mails, letterhead. Holding itself out is Tiernan and Hoover the very next day after the asset purchase agreement closed. And that's why we feel that clearly ManWeb did continue Tiernan and Hoover's operations. We would ask that this court reverse the decision of the district court. Thank you. Thanks to both counsel. The case is taken under advisement.